Kyle Rusness v. Becker County, Minnesota, et al. Mr. Nelson, when you're prepared, you may proceed. May it please the court, counsel. My name is Oliver Nelson III and I represent the appellant in this case, Kyle Rusness. From the beginning of Mr. Rusness' 17 day period of incarceration at Becker County Jail, his condition continued to deteriorate to the point that on February the 3rd, when he was taken emergently to the hospital, he was found to be on death's door with life-threateningly low hemoglobin and platelet levels. He was also found to be experiencing bleeding into his brain and eyes, something that could have been prevented had Becker County Jail correctional staff taken him to the hospital as early as February the 2nd, 2015. The district court dismissed Mr. Rusness' Eighth Amendment deliberate and different claims against Becker County Jail and its staff on the basis of qualified immunity. The district court erred in coming to this conclusion and its decision should be reversed for three reasons. The first reason is that the district court failed to view critical evidence in this case in a light most favorable to Mr. Rusness as it was required to do in this setting. On admission to Becker County Jail on January 17th, 2015, Mr. Rusness complained among other things of bleeding gums, extreme fatigue, dizziness, and blurred vision. What day was that? January the 17th, 2015. Okay. And when did he arrive? Your Honor, I believe there's been some dispute about that. We believe he arrived on January the 16th or the 17th, but the sick request call form that he filled out where he complained of these symptoms is dated as January 17th, 2015. So almost the same time of arrival or within a day or two of his arrival. That's correct, Your Honor. After his admission and after a physician's assistant visit on January 24th, 2015, that resulted in a gingivitis diagnosis, his condition worsened and reached a tipping point on January 27th, 2015. When is the first date you contend these jail personnel would have been on notice that his condition was such that hospitalization was required? Your Honor, we would- Or what action should they have taken in notifying medical staff of the hospital? Or at what point are you saying that the facts were such that the person's suit here, the jail personnel were on notice or became aware of his condition being so severe that ignoring it amounted to deliberate indifference? Your Honor, I would say that even upon admission, Mr. Rusness was complaining of symptoms that were serious enough that even a lay person would have recognized that he should have been transferred to a hospital even on January 17th, 2015. But I would also say that his condition reached an especially critical and dire point on January 27th, 2015, when the corrections officers came to his cell and they observed blood on his walls. They observed blood on a mattress. One corrections officer noted that there were two and a half ounces of blood in a cup that was next to him. Officer John Freeman noted that during this bleeding incident, Mr. Rusness was essentially motionless and was basically following the corrections officers with his eyes. Excuse me, Your Honor. Yeah. Mr. Oliver, during this period of time, sort of ongoing, and maybe you could tell me how long that was, but wasn't he also seeing medical personnel as well? And didn't they also fail to see the seriousness of what ultimately turned out to be leukemia? Well, that's an important point, Your Honor. Mr. Rusness did see a physician's assistant on January the 24th, 2015, who diagnosed him with gingivitis and who also noted in her record that with respect to his myriad of complaints, he should be seen by a doctor. Then on January 25th, 2015, another Becker County Jail Corrections Officer, Officer Christopher Burton, initiated his own sick request call form and stated that, I know he was seen by a medical provider the day before, but his condition looks worse to me and he needs to be evaluated. On January 26th, 2015, Mr. Rusness is seen by Nurse Teresa Ulmer and he complains to her of symptoms that he had never complained of before, such as vomiting day and night, excuse me, blood coming day and night from his mouth, a blood spot in his left eye and a loss of appetite. At that point, even Nurse Teresa Ulmer expressed to another Becker County Jail Corrections Officer that she was concerned about his condition, but she wanted to see if the antibiotic that he had been given for the later. Importantly, she also said that if there were any additional incidents of bleeding, that that should be reported. That was on January 26th, 2015 and on January 27th, 2015, we have the bleeding incident. Is there any evidence of a failure on the part of the officers to communicate important changes in condition between his encounters with nurse personnel? I'm sorry, Your Honor, could you state that question again? Is there evidence in the case to indicate that from the time he's seen by a nurse and the personnel who are supervising his presence there are aware of how he's being treated, if they failed somehow to update the case, to indicate that there should be some elevation of medical attention? Yes, Your Honor. Again, Nurse Teresa Ulmer stated in her January 26, 2015 note that any further bleeding should be reported. We had the January 27th bleeding incident and we contend, Your Honor, that if the evidence is viewed in a light most favorable to Rusnus, that Becker County Jail refused to follow that directive. They did not report the bleeding incident. I'm sorry, Your Honor. I mean, there's a dispute, isn't there, about whether there was a phone call made, if I remember the record, if you'll clear it up for me, but wasn't there a note provided to the nurses as well, or is my recollection off? No, your recollection is accurate, Your Honor, and two corrections officers have claimed that they wrote up a report of the incident and placed it in the nursing's box in the nursing station for the nurse to see. What we would argue, Your Honor, is that if you look at the nursing logs on January 27th and January 28th, there's no mention of the bleeding incident. Vivian Anderson, the nurse that claims that she initiated the call to an on-call nurse, on the one hand, she claims she initiated the call, but then on the other hand, she states, well, I don't know if it was me. It could have been someone else. She also says that because such a call is essentially memorializing, that type of call is important, that that call would be noted in Becker County Jail documentation, in their activity logs or in the nursing logs, and that call is not mentioned in the nursing logs or the Becker County Jail activity logs. Also, I would say that the nurse that saw Mr. Rusness testified at her deposition that she was never made aware of this incident. She saw Mr. Rusness on January 26th, 2015, and she saw him again on February 2nd, 2015. She testified at her deposition that even as of February the 2nd, 2015, she had no idea that this incident had occurred, and she also testified that had she been made aware of this incident, that she would have wanted to see Mr. Rusness, so Your Honor, we believe that all of those facts taken in their totality create a reasonable inference that, in fact, Becker County Jail staff essentially did not report the incident as they claimed that they did. Wouldn't it be incumbent upon Mr. Rusness to inform the nurse about these things? If he's seeing her periodically. Well, Your Honor, he saw Teresa Ulmer on two occasions, and when he saw her, he reported his bleeding problems on January 26th, 2015. Even after that, he submitted sick request call forms, essentially complaining that his conditions were getting worse. He saw her, and all this time, Your Honor, he's saying, I need to be seen by a doctor. The physician's assistant stated on January 24th, 2015, that I need to be seen by a doctor. Get me to a doctor. He stated that in multiple sick request call forms that he submitted, but, of course, that didn't happen until February the 3rd, 2015, when at that point, there was already an extensive brain bleed. There was bleeding into his eyes, and he was literally on death's door. Plaintiff's own expert, Dr. Robert Blake, testified in this case that someone that has a platelet level as low as Mr. Rusness's, or excuse me, he testified that someone who experiences a brain bleed like Mr. Rusness essentially typically dies. He says those brain bleeds are often fatal, and Mr. Rusness, in a real sense, is fortunate to be alive today. Yes, Your Honor. What date was he transported to the hospital? Can you remind me? He was transported to the hospital on February the 3rd, 2015. Thank you. Your Honor, and it's also important to note that our expert, Dr. David Hellerstein, has opined that had the transfer to the emergency room taken place earlier, there would likely not have been a brain bleed and bleeding into his eyes. We are not contending that an earlier transport to the hospital would have in any way affected the diagnosis of leukemia or the ultimate outcome of the leukemia diagnosis. What we're saying is that the symptom of the brain bleed, which is oftentimes fatal, did not need to occur. The symptom of the bleeding into the eyes did not need to occur had there been a transport to the hospital as early as February the 2nd, 2015. And again, Mr. Rusness is ... Go ahead, Your Honor. Did those symptoms that you pointed out that maybe could have been avoided, did any of those have a long-term effect? Your Honor, my client is still dealing with issues with his left eye. Because of the bleeding into his eyes and the left eye scarring, his vision is not what it used to be. He also still suffers from PTSD symptoms. We provided an expert report by Dr. David Lund, who stated that because of sort of the nightmarish experience that he went through with respect to this neglect, he has nightmares now about being in a correctional facility and being essentially denied medical treatment. Your Honor, I would like to reserve the remaining portion of my time for rebuttal. Thank you, Mr. Nelson. Mr. Everett. Good morning, Your Honors. May it please the Court. Mr. Nelson, I represent the Becker County appellees in this matter who are the Becker County Sheriff, the county itself, and various members of the correction    Everett to come up to the podium and give us a brief introduction about his Although I want to delve into the issues as addressed by the district court and Mr. Nelson, I'd also like to focus for just a moment on the context of this case. The facts in this case belie a deliberate indifference claim. The appellant was in the Becker County jail for 17 days from January 17th until February 3rd. During that time, the undisputed evidence shows that he was seen by trained medical professionals on four occasions, three times by a jail nurse, one time by a physician assistant. In addition to that, appellant refused an earlier nurse visit when she attempted to see him. A medical appointment was scheduled for February 3rd. A dental appointment was established for him for February 4th. The physician assistant who saw appellant on January 24th diagnosed him with gingivitis and a leg infection. She prescribed an antibiotic and mouth rinse. The medical people who saw appellant saw him before and after the alleged shortcomings that he attributes to the correctional staff. The medical professionals did not detect any medical condition that required more, greater, or more immediate medical care than what the appellant was already receiving. What does the record say about a request to see a physician? Is there evidence in the record to indicate that the plaintiff asked to see a physician for the symptoms he was experiencing? There is evidence in the record. He was seen by the PA on January 24th. He had submitted sick call requests before and after the physician assistant visit that happened that Saturday. On Monday, nurse Teresa Ulmer saw him. There's no evidence that correction staff had awareness of that. Mr. Rusness asked Ulmer, the nurse, to be sent to a physician. Ulmer, the nurse, made the determination that the antibiotics needed some time to kick in and that there was no need for a doctor's visit at that point. Nurse Ulmer decided that the antibiotics needed to kick in. Nurse Ulmer said, I have some concerns about this, but no need for medical follow-up at this time. Under this court's precedent in Roberts v. Koppel, the county defendants are entitled to dismissal. Two years ago in Roberts, this court reaffirmed the principle that officers cannot be held liable for failing to identify a serious condition that has eluded the medical professionals. Mr. Rusness was first seen by a nurse on the 21st of January. Mr. Rusness was last seen by a nurse on the 2nd of February on the eve of the officers deciding he needed to go to the hospital. At no time did the nurses indicate that more, greater, or more immediate care was required. What about the allegations of the failure to report the bleeding on the 27th? There, the evidence is absolutely undisputed, Your Honor, that there were three reports made to the nursing staff on January 27th. At 4.55 a.m., a corrections officer, Sergeant Matt Johnson, wrote in his report, I encountered Mr. Rusness at his cell. He had a cup in his hand with about three ounces of blood. We talked about it. I checked him. I couldn't detect the source of the bleeding. Johnson's testimony is unrebutted and undisputed that he wrote that report and placed it in the nurse's box. Report number two, corrections officer John Freeman was one who responded to Mr. Rusness's cell at 7 a.m. Is that the full obligation of jail staff when they make an observation such as bleeding unexplained, is to simply put a note in a box? Does it not go further than that when there might be obvious evidence of a more serious and emergent concern? To say that the bleeding is unexplained, Your Honor, is not quite in bearing of fidelity to the record. In Jones v. Department of Corrections, this Court said that the context has to be considered when one is looking at symptoms. Here, the officers, Officer Johnson at 4 a.m., was advised by Mr. Rusness that the bleeding was from snorting a line of meth. At 7 a.m., the officers were apprised or had knowledge that Mr. Rusness had a history or a diagnosis of gingivitis, that he had been given a mouth rinse and antibiotic by a PA. And Officer Vivian Anderson had also testified, and again unrebutted testimony, that she had experience with inmates having bleeding from the mouth from a condition that she described as meth mouth. There were plausible explanations for the bleeding beyond a serious medical condition. And beyond that, when Nurse Ulmer wrote the instruction on the 26th that we're talking about, she did not say, if you see bleeding, get him to a hospital, get him to a doctor, get him to a clinic, get him to an emergency room. As of the 26th, Mr. Rusness's reports of bleeding were thus far uncorroborated. No one at the jail had seen it, but he had talked about it. If we're going to have a debate about what the word report means in her instruction on the 26th, we can argue whether the meaning of the verb is to document and inform or to immediately contact, but the allegation against the officers is deliberate indifference. One cannot seriously argue that documenting, writing reports, putting them on the record of an incident reflects the wantonness and abduracy necessary to prove deliberate indifference. One could argue that it was perhaps negligent, but that does not get one to the standard of abduracy and wantonness. The district court below properly dismissed the case. Under this court's precedent in Ivey v. Audrain County, the burden is on a plaintiff who makes a deliberate indifference claim to show that the case law established beyond debate that a constitutional violation occurred. In Perry v. Adams from earlier this year, the court pointed out the essential factual correspondence that must exist between existing precedent and the circumstances confronting the officer so that the requirements that visit them under the Constitution are clear. In its ruling in Ivey, this Court observed that the district court had stated the standard too generally when it — when the Court said that a delay in medical treatment to a detainee who is exhibiting obvious signs of medical distress. But that's exactly the legal standard that Mr. Russness presented to the court below. At page 29 of his summary judgment brief, he claimed that he was entitled to relief because, and I quote, an intentional delay in providing medical care for an inmate could give rise to a violation. Following this court's precedent from Ivey, the court below held that this was too general a statement to support a claim of liability. How close does plaintiff get in demonstrating precedent with factual correspondence where here we have an inmate who is repeatedly seen by nurses and a physician assistant over the course of 17 days? There is no evidence in the record that the corrections officers failed to alert the nurses to the circumstances. The plaintiff cites a number of dental care cases that stand for the unremarkable proposition that delaying weeks or months or refusing to provide someone care for a dental condition could establish deliberate indifference. But the record is replete with information showing that plaintiff's dental concerns were treated. The nurse scheduled a dental appointment for him. When she saw him on February 21st, she made that appointment for February 4th. That's noted at Appellate 8 and Appellate, I'm sorry, Appendix 8 and Appendix 302. When he was taken to the medical clinic on the 24th, he was given a mouth rinse and an antibiotic. And on the 26th, a nurse saw him and authorized more Tylenol for the dental complaints he was making. In the appellant's reply brief, he takes particular issue with the court's treatment of the testimony of Corrections Officer Vivian Anderson. He asserts that had the district court more carefully weighed Officer Anderson's testimony, which was unrebutted, that the district court would not have accepted it as part of the summary judgment record. This is a clever attempt to shift the burden at summary judgment from the plaintiff who bears the burden of proof on the issue to the defendant. Appellate has the burden of proving deliberate indifference. Anderson testified that she contacted Sunnyside on January 27th, or she initiated contact rather, and had a nurse confirm her decision that further observation was appropriate. Anderson transferred the plaintiff to a medical observation cell. She watched his bleeding. She noted it subsided. There's no dispute that the bleeding did subside. In fact, on February 1st, when Plaintiff visited with his aunt, he told her the bleeding had ceased, and his symptoms, rather than being on some sort of straight line towards catastrophe, they changed. He told her he was no longer bleeding, he was now feeling more fatigued. But at any rate, isn't there maybe a fact issue on that question, though, because didn't Anderson say in her deposition that someone, she didn't know who, placed that call to the nurse? Her testimony was unrebutted at the outset. Plaintiff took no discovery to try to rebut that testimony. He didn't ask Nurse Sweep, who was the other nurse at the jail, whether she might have received the phone call, did not seek phone records from Sunnyside Care Center, did not even ask the other jail staff who were working that day if they had placed the call. The burden to put the fact issue in dispute is on the plaintiff. Moreover, Your Honor, it's not a material fact. There were two other established, undisputed routes of notification to the nurses that Mr. Rustis had experienced a bleeding incident. Thank you, Your Honors. Thank you, Mr. Everett. Mr. Nelson? Mr. Nelson, I think a big part of Mr. Everett's argument essentially boils down to if the medical personnel weren't able to recognize the seriousness of the potential situation, how can the corrections officers be expected to? And so what's your response to that? Our response to that argument, Your Honor, is that the medical professionals were not given the information that they needed to come to a correct determination as to the seriousness of Mr. Rustis's condition. Again, we contend that the January 27, 2000, bleeding incident was never reported. Nurse Ulmer, the nurse who most often saw Mr. Rustis during the 17-day period, stated she had no idea about this bleeding incident. She testified at her deposition that had she been made aware of that bleeding incident, she would have wanted to see Mr. Rustis. So what we contend is that it's a situation where the corrections staff, again, did not provide Becker County medical staff with the information that they needed to come to a correct determination, also considering that Nurse Ulmer instructed them. She instructed Becker County staff to report the bleeding incident. And they did not do that. And again, had that been reported and had Nurse Ulmer or another nurse seen him on January 27, there is a strong likelihood, we believe, that he would have been transported emergently to the hospital, which was less than a block away. The hospital was less than a block away from the jail facility. Was the nurse asked the question, had you been made aware of the three ounces of blood situation, would you have taken him, sent him to the hospital? Was she asked that question? She was asked, Your Honor, I believe that she was asked at her deposition if she had been made aware of the bleeding incident, sort of more generally, would she have wanted to see Mr. Rustis, and she said she would. I see. Was she asked further, though, would you have then ratcheted up the treatment, taken him to the hospital, done something different, something additional? I don't know that she was asked that particular question, Your Honor. But her deposition testimony is in the appendix for the court's review. Thank you. Your time is expired, but I have one more question. The county says that the plaintiff communicated with someone after the 27th that his bleeding had ceased or was better, and he was no longer complaining about the bleed. Is that accurate? What happened after the 27th? After the 27th, Your Honor, I believe there was a phone call that took place between him and his aunt where he indicated that the bleeding, I believe, had subsided. But then there were other sick request call forms that were filed where he talked about the bleeding again. Indeed, on February 2, 2015, before he was taken to the hospital, he complained of bleeding. I would also note that Dr. Robert Blake, defendant's own expert, has testified in this case that someone that has a platelet level of 4,000 or less, which is what Mr. Rustis had, is typically someone in that condition has experienced a significant amount of bleeding. Because, again, that is a life-threatening low platelet level, according to Dr. Robert Blake, their own expert. Thank you. Thank you, Mr. Nelson. Thank you also, Mr. Palmer. Court appreciates both counsel's participation in argument this morning, and we'll take the case under advisement.